# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**JOAN M. BOLDEN,**

     **Plaintiff,**

**vs.**                 **Case No.: 8:23-cv-00531-SDM-JSS**

**KAREN E. RUSHING, in her official capacity as Clerk of the Circuit Court and Comptroller of Sarasota County,**

     **Defendant.**

_____/

## DECLARATION OF JANET CANTEES

1.     My name is Janet Cantees.  I am the Chief Operations Officer for the Clerk of the Circuit Court and Comptroller of Sarasota County.  I joined the Clerk's Office as the Human Resources Officer in May 1999.  In March 2002, I was promoted to Chief Deputy, a role that was retitled to Chief Operations Officer in January 2010.  I am giving this declaration under the penalty of perjury and of my own free will.

2.     As the Chief Operations Officer, I report to the Clerk of Court and Comptroller Karen Rushing.

3.     My responsibilities as Chief Operations Officer are oversight of all support services Departments, consisting of Human Resources, Clerk Finance,

Enterprise Information Services, and the Administrative Services office. I also lead and provide support to leadership on strategic initiatives and strategic planning for the organization, and am involved in troubleshooting technology systems and Departmental business processes.

4.      The facts set forth in this Declaration are true and correct. Except as otherwise indicated, I have firsthand knowledge of all the hiring, promotional, disciplinary, and appointment decisions discussed in this Declaration.

5.      Where I do not have such knowledge, my knowledge comes from a review of records kept by the Clerk's Office in the regular course of business.

6.      I have read the Second Amended Complaint filed by the Plaintiff in this lawsuit, Joan Bolden, and Ms. Bolden's interrogatory responses. I also attended Ms. Bolden's deposition as a corporate representative for the Clerk's Office.

**A.      Other Positions Unsuccessfully Sought by Ms. Bolden**

**Manager of Traffic & Fines and Manager of Civil Courts & Child Support**

7.      In February 2010, the Clerk's Office internally posted two managerial job openings.

8.      The openings were the Manager of Traffic & Fines and the Manager of Civil Courts & Child Support.

9.     Ms. Bolden, who at the time held the position of Supervisor of Court Units, applied for both positions.

10.     After the Manager of Traffic & Fines job was posted, Susan Higel, an employee of the Clerk's Office who had been the Manager of Traffic & Fines from 2002 to 2007 until she was asked to transfer to the Clerk's Office's Venice branch, expressed interest in returning to her former position.

11.     Ms. Higel was the best-qualified applicant for Manager of Traffic & Fines position, as she had the most experience in the job, and her experience in the Civil Customer Service and Public Access areas allowed the Clerk's Office to consolidate three customer service functions under one Manager.  The Clerk's Office transferred Ms. Higel to the position on February 22, 2010.

12.     Ms. Higel is Caucasian.

13.     After the Manager of Civil Courts & Child Support position was posted, four other employees of the Clerk's Office applied.  Besides Ms. Bolden, the other internal applicants were Sherri Hutchinson, Lorraine Greer, Karen Oberg, and Janice Conway.

14.     Ms. Hutchinson, Ms. Greer, Ms. Oberg, and Ms. Conway are Caucasian.  Ms. Hutchinson held the position of Criminal Intake Supervisor.

15.     All of the candidates except Ms. Conway chose to participate in a panel interview before seven directors and managers, including Michael Higdon, at the time the Clerk's Office Manager of Recording and the former

Manager of the Venice branch of the Clerk's Office.  Mr. Higdon is African-American.

16.    When the interview scores were tabulated, Ms. Hutchinson's scores were the highest, and the Clerk's Office offered her the position as the best-qualified candidate.  Ms. Hutchinson accepted.

**Director of Court Services (2014)**

17.    In May 2014, the Clerk's Office posted a position for Assistant Director of Court Services.

18.    Ms. Bolden applied for the position, as did a Caucasian manager named Steve McElroy.  The position was closed without being filled, as the Clerk's Office determined that creating an Assistant Director job only would create another layer of management in this large unit, with decisions continuing to be funneled to the existing Director.

19.    Later in 2014, the Clerk's Office comprehensively restructured its operations to create an enhanced service model, to create more efficient services and processes, and to address evolving and changing service needs. The restructuring resulted in the creation of a second Director of Court Services position.

20.    The second Director of Court Services job was a senior management position requiring at least seven years of director-level management experience and for which an MBA or a law degree was preferred.

21.     A copy of the job description for the Director of Court Services position is attached as Exhibit A.

22.     The Director of Court Services job was not posted.

23.     Ms. Bolden and Mr. McElroy did not meet the experience requirement of the Director of Court Services job, and were not qualified.

24.     The Clerk's Office appointed Stacy Dillard-Spahn to the Director of Court Services position.  Ms. Dillard-Spahn had been a shareholder in the Sarasota law firm of Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., since 2005.  Prior to going into private practice, Ms. Dillard-Spahn had been a prosecutor for three years and a public defender for nearly six years and had ranked fourteenth out of 115 students in her class at the University of Oregon Law School.

25.     Ms. Dillard-Spahn is Caucasian.  She left the Clerk's Office in 2015 and her position was not filled, with her responsibilities being divided and allocated between the Director of Court Services Katherine Plante and General Counsel Irene Baxter-Plank.

**Human Resources Officer**

26.     In October 2014, the Clerk's Office's Director of Human Resources, Edith "Eydie" Peacher, retired.

27.     The Clerk's Office retitled the position to Human Resources Officer and posted the job.

28.    Ms. Bolden applied, as did Ms. Hutchinson.

29.    The job was a senior management position with organization-wide responsibilities that involved high-level strategic decision-making. It required from seven to ten years of experience serving in a senior management position, and in-depth knowledge of the basic principles and laws applying to personnel administration and management, employee selection, compensation, employee relations, training and development, and employee benefits. An MBA was the preferred level of education. A copy of the job opportunity announcement, listing the purpose and qualifications for the position, is attached as Exhibit B.

30.    Neither Ms. Bolden nor Ms. Hutchinson were qualified for the job, as neither candidate met the work experience and management experience requirements for the position.

31.    The Clerk's Office hired Holly Young for the Human Resources Officer job. Ms. Young had been the Director of Human Resources for Bright House Networks since 2012. In the five years preceding that job, she had been a Senior Human Resources Business Partner for Honeywell, the Director of Human Resources for CAE Healthcare, and the Human Resources Manager for AAR Precision Systems.

32.    Ms. Young held an MBA, a professional human resources certification, and was a Six Sigma Black Belt.

33.    Ms. Young is Caucasian.

34.    Ms. Young left the employment of the Clerk's Office in 2016.  After initially posting the position again, the Clerk's Office did not fill it and has not had a Human Resources Officer or Director of Human Resources since.

**Human Resources Coordinator**

35.    In April 2018, the Clerk's Office posted and advertised the open position of Human Resources Coordinator.  This is a non-supervisory position with a pay range significantly below a Manager position pay range.

36.    The Clerk's Office received a total of 320 applications for the position.

37.    Three hundred and seventeen of the applicants for the Human Resources Coordinator job were external, and three were internal.  The internal applicants were Ms. Bolden, Senior Accounting Technician Sherise Nelson, and Melissa Hanks, a Caucasian woman who worked for the Clerk's Office as a Processing Clerk in Court Services.

38.    The Clerk's Office screened the experience and education of the applicants using a point system.  It then further screened the applicants via phone interviews.

39.    Eight applicants, including Olivia Doraisamy, were invited to participate in an interview before a panel that included then-Supervisor of Criminal Processing Shakira Rolle, who is African-American.  Five of the eight elected to continue before the panel.  Ms. Bolden, Ms. Nelson, and Ms. Hanks

were not invited to participate in panel interviews.

40.     Ms. Doraisamy identifies as "two or more races." Her work history included working as a Human Resources intern during the two preceding summers and between semesters while studying at Florida Gulf Coast University.  Ms. Doraisamy had graduated from FGCU with a Bachelor's degree in Business Management with a concentration in Human Resources. She was certified by the Society of Human Resource Management, and had been active in her university's SHRM chapter.

41.     Ms. Doraisamy scored the highest in the panel interview process and was hired as the best-qualified candidate.

**B.      Persons Ms. Bolden Claims Were Favored by the Clerk's Office Because of Their Race**

<u>**Alicia Accardi**</u>

42.     In April 2007, the Clerk's Office sought a Manager of Communications, posting the job and externally advertising it.

43.     I was the hiring manager for this position.

44.     The job description for the position originally required a Bachelor's degree in English, Journalism/Communications, Public Relations, or a closely related field.  A copy of the original request to fill the position, listing the qualifications for the job, is attached as Exhibit C.

45.     The Clerk's Office received no applications for the position,

although one person, a Caucasian woman from outside the Clerk's Office named Alicia Accardi, expressed interest.

46.     Ms. Accardi did not have a Bachelor's degree.

47.     I discussed the challenges presented by the job market with Clerk Rushing.  As a result of this discussion, the Clerk's Office revisited the educational requirement to allow progressively more responsible professional experience to substitute for a Bachelor's degree on a year-for-year basis.

48.      The Manager of Communications job then was re-posted and re-advertised.  A copy of the revised job description is attached as Exhibit D.

49.     The only applicant was Ms. Accardi, who was hired on July 30, 2007.

50.     According to her resume, Ms. Accardi had a year of college coursework at the University of Massachusetts Amherst, had worked for three years as a Community Relations Program Coordinator for another public employer in southwest Florida, and had public relations experience.

**Shelly Adkins**

51.     In October 2012, the Clerk's Office demoted a Caucasian woman named Shelly Adkins from the position of Manager of Accounts Payable to the position of Business Process Analyst.

52.     Ms. Adkins had held this position since 2005.

53.     I was involved in the demotion decision.

54.     Ms. Adkins was an effective manager.  She was demoted after she made an error in judgment in reporting her absences during a sensitive medical situation.  The demotion not only served as corrective action, but as an accommodation which would allow Ms. Adkins to address the medical situation from a non-management role.

55.     In 2014, I recommended that Ms. Adkins be appointed to the position of Manager of General Services and Procurement.

56.     The job description for the Manager of General Services and Procurement position required a Bachelor's degree in business or a related field, but also allowed progressively more responsible professional experience to substitute for the required education on a year-for-year basis.  A copy of the job description is attached as Exhibit E.

57.     Ms. Adkins did not have a Bachelor's degree, but did have sufficient professional experience to substitute, as she had worked for the Clerk's Office for seven years as a Manager.

**Erin Cooper**

58.     In August 2007, the Clerk's Office appointed Erin Cooper, the Assistant Manager of Criminal Courts and a Caucasian woman, to the position of Manager of Court Clerks.

59.     Ms. Cooper had been the Assistant Manager of Criminal Courts since 2001.

60.    The appointment to Manager of Court Clerks was the result of a critical situation where the existing Manager had been out on medical leave for an extended period.   The Clerk's Office was implementing a new case management system, and the project teams needed decisionmakers involved in the implementation process.

61.    Ms. Cooper had been performing the duties of the Manager of Court Clerks during the existing Manager's medical leave.

62.    Ms. Cooper was recommended by Irene Baxter-Plank, who at the time served as the Clerk's Office's General Counsel and had authority over the Court Services Department.   I supported Ms. Baxter-Plank's recommendation.

63.    The job description for the Manager of Court Clerks position requires a Bachelor's degree in business management or a related field.   A copy of the job description is attached as Exhibit F.

64.    Ms. Cooper earned an Associate's degree in Business.   She was appointed without a Bachelor's degree due to emergent circumstances and her performance during the medical absence of the existing Manager.

**Jeni Field**

65.    In October 2017, the Clerk's Office promoted Jeni Field, a Caucasian woman who held the position of Manager, Second Shift and who was working as the interim Manager of Records Management, to the Manager of Records Management position on a full-time basis.

66.   The Clerk's Office posted the Manager of Records Management position internally.

67.   In addition to Ms. Field, two other current employees sought the position: Shakira Rolle, an African-American woman with a Master's degree who held the position of Supervisor of Court Units, and Laurence Perretti, a Caucasian man who held the position of Supervisor of Recording.

68.   Both the Manager, Second Shift and Manager of Records Management positions required a Bachelor's degree.   Copies of the job descriptions for these positions are attached as Exhibits G and H.

69.   Ms. Field represented in her original 2011 application for employment with the Clerk's Office that she had a Bachelor's degree.  Ms. Field's resume also showed a history of higher education in Ireland, her native country.   Copies of Ms. Field's application and resume are attached as Composite Exhibit I.

**Lisa Finkelstein**

70.   In 2014, the Clerk's Office appointed employee Lisa Finkelstein, a Caucasian woman, to the position of Manager of Administrative Services as part of an organizational restructuring.

71.   I recommended Ms. Finkelstein for the position.

72.   The Manager of Administrative Services job required a Bachelor's degree in Public Administration, Business, Communications, Marketing, or a

related field. A copy of the job description is attached as Exhibit J.

73.   The job description allows for progressively more responsible professional experience to substitute for the education requirement.

74.   Ms. Finkelstein had professional experience that, in the judgment of the Clerk's Office, substituted for a Bachelor's degree. Before her appointment, Ms. Finkelstein had worked for the Clerk's Office for more than thirty years administratively supporting Clerk Rushing and senior management.

**Nicolette Snyder**

75.   Nicolette Snyder is a Caucasian woman and the former Payroll Manager for the Clerk's Office.

76.   Ms. Snyder held the position of Payroll Supervisor starting in 1993, before I began employment with the Clerk's Office. I have knowledge of this fact from records kept by the Clerk's Office in the regular course of business.

77.   Ms. Snyder obtained her Certified Payroll Professional ("CPP") certification in 1994.

78.   The Payroll Supervisor job was reclassified to managerial in 1994 as a result of a pay study conducted for the Clerk's Office and Sarasota County by an outside consultant. The consultant recommended that, based on Ms. Snyder's responsibilities and experience, the job should be upgraded.

79.     The current job description for the Payroll Manager position was developed in 2002.  The description requires a Bachelor's degree, but indicates that this requirement may be offset by extensive, relevant experience in addition to a CPP certification.  A copy of the job description is attached as Exhibit K.

80.     While the Payroll Manager job description was formulated at a time when Ms. Snyder already held the position, she met the qualifications in the description.  Ms. Snyder had extensive, relevant experience, as based on my personal knowledge and review of Clerk's Office records, she had been the supervisor of payroll services for many years before 2002.  She also held a CPP certification.

**Julianne Niebour**

81.     The Clerk's Office hired Julianne Niebour, a Caucasian woman, to the position of Employment Specialist in January 2015.

82.     The Employment Specialist position is responsible for recruiting and other aspects of the hiring process.  The job description for the position requires an Associate's degree in Human Resources Management, Business, or a related field, and a professional human resources certificate.  A copy of the job description is attached as Exhibit L.

83.     Prior to hiring Ms. Niebour, the Clerk's Office posted the Employment Specialist position internally and advertised it externally.

84.   In the judgment of Holly Young, at the time the Clerk's Office's Human Resources Officer, a member of senior management, and the person to whom the Employment Specialist would report, the internal and external recruiting effort did not produce any strong candidates.

85.   Ms. Niebour has an Associate's degree, but not in one of the required fields.

86.   Following the unsuccessful recruiting effort, Ms. Niebour was recommended by Ms. Young.

87.   Ms. Young advised the Clerk's Office that she and Ms. Niebour previously had worked together at CAE Healthcare, a large employer in the private sector with over 1,000 employees where Ms. Young had been the Director of Human Resources. Ms. Young advised that Ms. Niebour had been the Human Resources Coordinator for CAE Healthcare, with recruiting responsibilities. The Clerk's Office proceeded to interview Ms. Niebour.

88.   Ms. Niebour was hired because of her strong background, the unsuccessful recruiting effort, and Ms. Young's recommendation.

**Charles Maloney**

89.   In 2016, Manager of Board Records Pauline Shaw, an African-American woman, retired.

90.   Ms. Shaw's position went unfilled until January 22, 2022, when the Clerk's Office appointed Charles Maloney, a Caucasian man and the

Supervisor—Board Records from March 2017 until that date.

91.    Mr. Maloney has three years of college credits but does not have a degree.

92.    When Mr. Maloney was appointed to the Supervisor—Board Records position in 2017, the job did not have an educational requirement, saying only that a degree was preferred.   A copy of the applicable job description for this position is attached as Exhibit M.

93.    In 2010, the job description for the Manager of Board Records position required a Bachelor's degree, but allowed relevant experience to substitute for a Bachelor's degree on a year-for-year basis.   The description thereafter was changed to eliminate the allowance for substitution, but in January 2022, Director of Finance Nicole Jovanovski assessed staffing needs in the Board Records Department.   In consultation with Human Resources, Ms. Jovanovski advised reinstating the allowance for substitution of relevant experience, because Mr. Maloney capably had been performing both supervisory and managerial level responsibilities in Board Records since 2017.

94.    A copy of the revised job description for Manager of Board Records is attached as Exhibit N.

95.    Prior to becoming employed by the Clerk's Office in 2014, Mr. Maloney had worked for over twenty years as a supervisor with Capgemini and the Herald-Tribune Media Group.

**David Beirau**

96.     In September 2015, the Clerk's Office appointed David Beirau, a Caucasian man, to be its Director of Internal Audit and Inspector General after the previous Director resigned.

97.     The Director of Internal Audit position was not posted internally.

98.     Mr. Beirau had been the Clerk's Office's Manager of Audit Services, a position to which the Clerk's Office had appointed him in October 2014.

99.     Before this, Mr. Beirau had worked for the Clerk's Office as a Senior Internal Auditor since 2012, and from January 2007 to 2012 as a senior auditor for Purvis Gray & Co., an accounting firm, where he participated in audits of local governments and municipalities in the State of Florida.

100.    As the Senior Internal Auditor, Mr. Beirau served as the lead auditor on many projects, where he supervised audit staff and reviewed all working papers and reports prior to their presentation to the Director of Internal Audit.

101.    At the time of his appointment to Director of Internal Audit, Mr. Beirau held certifications as a Certified Fraud Examiner, a Certified Inspector General, a Certified Inspector General Auditor, and a Certified Inspector General Investigator.

102.    The job description for the Director of Internal Audit position

required a minimum of ten years of demonstrated relevant experience in the discipline of internal auditing, or in government auditing, public accounting, or public administration, with a minimum of five years of experience in the planning, management, and execution of complex audits, investigations, and special projects.

103. A copy of the Director of Internal Audit job description is attached as Exhibit O.

104. The Clerk's Office appointed Mr. Beirau as the logical successor to the Director of Internal Audit position. While he did not have ten years of experience, his demonstrated experience with the Clerk's Office and in the private sector, along with his educational and certification accomplishments, were judged sufficient.

**Nicole Jovanovski**

105. In September 2015, the Clerk's Office appointed Nicole Jovanovski, a Caucasian woman, to the position of Director of Finance.

106. The Director of Finance job was not posted internally.

107. Ms. Jovanovski previously had served the Clerk's Office in several capacities in its Finance Department. She began as a Financial Accounting Analyst in 2003 and was promoted to Senior Financial Accounting Analyst in 2005. She obtained her CPA in January 2012. The Clerk's Office appointed Ms. Jovanovski to the position of Assistant Director of Finance in April 2014.

108. As a Senior Financial Accounting Analyst, Ms. Jovanovski served as the lead role on special projects and employee training, and served as the back-up to the Clerk's Office Treasury Management Officer. As the Assistant Director of Finance, Ms. Jovanovski directly supervised the Treasury Management Officer, the Board Records Manager, the Accounts Payable Manager, the Payroll Manager, the Financial Systems Specialist and the Accounting Services Manager. She also assisted the Director of Finance with management of the Department.

109. The job description for the Director of Finance position requires at least five years of increasingly more responsible experience in governmental accounting and finance, with a minimum of five years of administrative and supervisory responsibilities.

110. A copy of the job description for the Director of Finance position is attached as Exhibit P.

111. The Clerk's Office determined that Ms. Jovanovski's responsibilities as a Senior Financial Accounting Analyst and as Assistant Director of Finance satisfied the experience requirement for the Director of Finance position.

**Laura Bricker**

112. In October 2023, the Clerk's Office promoted Laura Bricker, a Caucasian woman, to the position of Manager of Recording.

113.   The job description for the Manager of Recording position requires a minimum of six years of work experience in a professional customer service work environment, and a minimum of six years of management or supervisory experience.

114.   A copy of the job description for the Manager of Recording position is attached as Exhibit Q.

115.   Ms. Bricker met the experience requirements for the position at the time of her promotion.  She had worked for four years and seven months as a Subway store manager; for the Clerk's Office for a total of twenty-two years as a Deputy Clerk, Executive Secretary, and Compliance Coordinator, and for the Clerk's Office for one year and five months as the Supervisor of Recording.

## C.   Instances Where Ms. Bolden Claims That African-American Employees Were Not Promoted for Discriminatory Reasons

### James Clarke

116.   James Clarke is African-American and a former employee.  Based on my review of Human Resources records kept in the regular course of business, the Clerk's Office hired Mr. Clarke as a Records File Clerk in 1994.

117.   In 1997, the Clerk's Office appointed Mr. Clarke to a Support Technician position following his submission of a Request for Consideration for the job.

118.  In 2000, after I began employment with the Clerk's Office and came to have firsthand knowledge of his Department, the Clerk's Office appointed Mr. Clarke to a Desktop Support Analyst position.

119.  In 2003, the Clerk's Office appointed Mr. Clarke to a Courts Programming Analyst position.  The Clerk's Office reclassified this job in October 2009 to Systems Analyst.

120.  Mr. Clarke did not pursue any position following his 2003 appointment to the Courts Programming Analyst position.  In 2014 he resigned his employment with the Clerk's Office and went to work for a law firm.

**Sherise Nelson**

121.  In 2018, Sherise Nelson sought the position of Human Resources Coordinator for which the Clerk's Office selected Olivia Doraisamy from among 320 applicants.

122.  Ms. Nelson was an African-American woman who worked for the Clerk's Office as a Senior Accounting Technician.  She did not have a background in human resources.

123.  Of the 320 applicants, three were internal.  In addition to Ms. Nelson, the internal applicants were Ms. Bolden and Ms. Hanks.

124.  Ms. Doraisamy was the best-qualified applicant for the position. Neither Ms. Nelson nor Ms. Hanks were among the eight candidates asked to participate in a panel interview.

**Gayla Tynes-Jones**

125.   Gayla Tynes-Jones is African-American and a former employee.

126.   In February 2016, the Clerk's Office posted an opening for the Manager of the Venice Branch.   Ms. Tynes-Jones, at the time the Clerk's Office's Supervisor of Court Units, applied.

127.   Seven applicants were selected for a panel interview with Ms. Young, General Counsel Irene Baxter-Plank, and Director of Court Services Kathy Plante.   Five of the seven were internal candidates, including Ms. Tynes-Jones. The other candidates were James Schulz, a Caucasian man with a Ph.D who worked as the Manager of Civil Processing; Stacey Mininsohn, a Caucasian woman with a Bachelor's Degree in Criminology who had worked for the Clerk's Office in three different supervisory jobs and had past work experience in banking, legal administration, and real estate; Georgia LaVoy, a Caucasian woman with a Master's degree in Criminal Justice Administration who had worked for the Clerk's Office since 2005, and Katie Maloney, a Caucasian woman with an MBA who worked with the Clerk's Office as a Customer Service Representative following time in the private sector as a manager in the hospitality industry.

128.   Two of the panel interview participants were external.  These were Brian Merryman, a Caucasian man with an MBA, and Jessica Migenis, a Hispanic woman with a Master's degree in Public Administration who had

worked for eighteen years for the Highlands County Clerk of Courts, including time as its Director of Civil Traffic, Juvenile and Teen Court.

129.   After the panel interviews, the Clerk's Office selected Ms. Migenis as the best-qualified candidate, based on her education, experience, and panel interview performance.

130.   In June 2016, the Clerk's Office posted an opening for the Manager of Records Management position.  Ms. Tynes-Jones applied.

131.   Four internal applicants, including Ms. Tynes-Jones, were selected for a panel interview with Ms. Baxter-Plank, Ms. Plante, and Employment Specialist Julianne Niebour.  The other candidates were Ms. Mininsohn; Ms. LaVoy; and Jeni Field, the Clerk's Office Manager, Second Shift.

132.   After the panel interviews, the Clerk's Office selected Ms. Mininsohn as the best-qualified candidate as she was the only candidate the interview panel recommended for hire out of those who were interviewed.

**Shakira Rolle**

133.   Ms. Mininsohn left the employment of the Clerk's Office in 2017, and the Manager of Records Management position was re-posted.

134.   Three internal applicants were identified to participate in a panel interview.   In addition to Ms. Rolle, the applicants were Ms. Field and Laurence Perretti, a Caucasian man with a Bachelor's degree in management who had held supervisory and management positions with the United States

Air Force for eight years.

135.   The Clerk's Office selected Ms. Field as the best-qualified applicant.   Ms. Field had the necessary experience, education, and management experience with the Clerk's Office, and had been serving as the interim Manager of Records Management after the departure of Ms. Mininsohn.

136.   In October 2018, after panel interviews, the Clerk's Office promoted Ms. Rolle to Manager of Special Processing over Ms. LaVoy and Mr. Perretti.   Ms. Rolle held this position until 2021, when she resigned her employment with the Clerk's Office.

**Pauline Shaw**

137.   In October 2004, the Clerk's Office posted an opening for the Manager of Board Records position.

138.   Three candidates were invited to participate in a panel interview during which each candidate was asked to complete an exercise.

139.   One of the candidates invited to participate was internal applicant Pauline Shaw, a Recording Secretary in the Board Records Department and an African-American woman.   The other two candidates were external.   The external candidates were Gregory Koss, a Caucasian man, and Jay Digma, an Asian man.

140.   The highest scorer during the panel interview exercise was Mr.

Digma, who was offered the Manager of Board Records job.  Ms. Shaw scored third of the three interviewees.

141.   Mr. Digma resigned after two days.  The Clerk's Office appointed Ms. Shaw to replace him.

142.   Following her appointment in October 2004, Ms. Shaw served as the Manager of Board Records until March 2017, when she retired.  Ms. Shaw did not apply for any other positions during her employment with the Clerk's Office.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

_7/12/2024_
DATE OF EXECUTION

_Janet Cantees_
JANET CANTEES